UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:23-CV-00026-GNS-HBB

GARY OAKMAN																						PLAINTIFF

v.

GENERAL MOTORS HOURLY RATE
EMPLOYEES PENSION PLAN et al.																	DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant's Motion for Judgment on the Administrative Record (DN 58) and Plaintiff's Cross-Motion for Judgment on the Administrative Record (DN 63). The motions are ripe for adjudication.

**I.      BACKGROUND**

Plaintiff Gary Oakman ("Oakman") brought this suit against the General Motors Hourly Rate Employees Pension Plan ("The Plan") and Fidelity Investments ("Fidelity"), as The Plan's administrator[1], to recover benefits pursuant to the Employee Retirement Income Security Act ("ERISA"). (Am. Compl. ¶ 1, DN 34).[2]  Oakman was an employee of General Motors ("GM") from April 17, 1995, to October 31, 2022. (Notice Filing Attach. 1, at 1-3, DN 57-1 [hereinafter Admin. R.]). Prior to working for GM, Oakman was employed by American Sunroof Corporation ("ASC") on September 27, 1989. (Am. Compl. ¶ 12; Admin. R. 6). Oakman became a GM

---

[1] Fidelity Investments was served on March 6, 2023 (DN 7) and again on April 26, 2023 (DN 21). This party has not filed an answer or a motion.
[2] Oakman initially named two additional Defendants in his Amended Complaint: (1) International United Automobile Aerospace and Agricultural Workers Local Union 1714 of Lordstown, OH, and (2) International United Automobile Aerospace and Agricultural Workers Local Union 1618 of Detroit, Michigan. (Am. Compl. ¶ 1). By agreed order, these parties were dismissed. (Agreed Order, DN 45).

1

employee as part of a joint venture between GM and ASC, in which certain ASC employees could join GM to work at the Lansing Craft Center, incentivized by the ability for each transfer employee to retain her/his seniority status from ASC. (Admin. R. 9).

The crux of this dispute concerns whether Oakman's credited years of service in determining his pension benefits under The Plan should include the time he worked for ASC. (*See* Am. Compl. ¶¶ 12-24). While employed by ASC, Oakman was not covered under The Plan, as he was not yet a GM employee. (Admin. R. 6). Oakman's membership in The Plan began on his first date of employment with GM. (Admin. R. 6). Oakman contends that part of the joint venture between GM and ASC provided that ASC employees would be credited by The Plan for the time they were employed by ASC. (Am. Compl. ¶ 15). The GM Benefits & Services Center ("GM Benefits") has stated that "[t]here was no agreement for [The Plan] to assume responsibility for any credited service earned while an employee of ASC." (Admin. R. 6). The terms of the joint venture stated:

> ASC employees . . . will receive, as their Plant Seniority date, 1-7-85, or their ASC hire date, whichever is later. They will receive a [GM] seniority date equal to their ASC hire date. The [GM] seniority date will be utilized as the date established for each employee for vacation pay allowance and paid absence allowance credit . . . .

(Admin. R. 12). At the time he joined GM in 1995, Oakman believed that this utilized "seniority date" would also include his credited years of service to ASC and be included in his pension calculation under The Plan. (Pl.'s Resp. Def.'s Mot. J. Admin. R. & Br. Supp. Pl.'s Mot. J. Admin. R. 3, DN 63-1 [hereinafter Pl.'s Resp. Def.'s Mot. J. Admin. R.][3] ("At the time, the employees did

---

[3] Oakman's response to The Plan's motion for judgment on the administrative record and his own memorandum in support of a cross-motion for judgment on the administrative record are contained in one document (DN 63-1). For the sake of clarity, this document will be referred to as Plaintiff's Response to Defendant's Motion for Judgment on the Administrative Record.

not know or understand that there was such a distinction between credited service and seniority . . . .")).

In 2007, Oakman inquired into his credited service time under The Plan, and a GM Benefits audit, dated June 26, 2008, indicated that Oakman's credited service was changed from 13.8 years to 19.1 years (i.e., taking into consideration his ASC service time). (Admin. R. 34-35). This change was apparently due to an erroneous application of a 2007 provision to Oakman's credited service. (*See* Admin. R. 35, 306). In November 2017, Oakman's records still indicated that his time at ASC was included in his credited service under The Plan. (Notice Filing Attach. 2, at 307, DN 57-2 [hereinafter Oakman Docs.]). In 2019, GM Benefits undertook an internal review of the joint venture between GM and ASC. (Admin. R. 305-06). As a result of the review, GM Benefits clarified that Oakman "is not eligible for additional service for the 2007 provision . . . . The 2007 Provision is for filling in for layoff periods not covered by bank[,] not periods not employed by GM[.]" (Admin. R. 306). Thus, in March 2019, an additional audit changed his credited service from 29.5 years back to 24.2 years (i.e., beginning with his start date at GM and not including his time with ASC). (Admin. R. 306). The review concluded that the joint venture employees should receive seniority dates based upon their start date with ASC, but that they did not "start 'earning' GM credited service until they were actually hired by GM . . . ." (Admin. R. 305). Oakman was made aware of this change to his credited service and its reasoning on March 7, 2019. (Admin. R. 37, 309-26).

In October 2020, GM and the union responsible for organizing the joint venture discussed the fact that many of the former-ASC employees were confused by the distinction between a seniority date and date of credited service. (Oakman Docs. 306-08). During this communication, GM acknowledged that Oakman initially "did receive credit service for the ASC time[,] but that

3

was taken back." (Oakman Docs. 315). Oakman retired from GM on October 31, 2022, and a GM audit totaled 28 years of credited service in calculating his retirement benefits. (Admin. R. 1-4). GM Benefits relayed the results of this audit to Oakman on November 17, 2022. (Admin. R. 5). Oakman then initiated an appeal to recover the ASC time that was retracted from his credited service, but his appeal was denied by The Plan's Pension Committee. (Admin. R. 6-7). Oakman based his appeal on both the alleged promise that his credited service would include his time at ASC as well as a provision in The Plan's terms which appeared to bolster this belief. (Admin. R. 6; Oakman Docs. 60-61). The Pension Committee explained that the terms of the GM-ASC joint venture included that the transfer employees would keep their seniority dates "for vacation pay allowance and paid absence allowance[,]" but that there was no agreement for The Plan to assume any credited service for the employees' pension calculation based upon their time working for ASC. (Admin. R. 6).

In the current case, Oakman seeks review of the Pension Committee's decision to deny him his additional benefits. The Amended Complaint states one cause of action: recovery of denied benefits under 29 U.S.C. § 1132(1)(B) [hereinafter ERISA § 502(a)(1)(B)]. (Am. Compl. ¶ 27).[4] The Plan has moved for judgment on the administrative record. (Def.'s Mot. J. Admin. R., DN 58). Oakman has responded and filed a cross-motion for judgment on the administrative record. (Pl.'s Cross-Mot. J. Admin. R., DN 63).

---

[4] Elsewhere in the Amended Complaint, Oakman states that he "also has standing to bring this action pursuant to 29 U.S.C. § 1132(a)(3)(A) & (B) [hereinafter ERISA § 502(a)(3)(A), (B)] . . . to enjoin acts and practices which violate provisions of ERISA and/or the terms of the GM Plan, and/or to obtain other appropriate equitable relief to redress such violations . . . ." (Am. Compl. ¶ 9). Whether Oakman may bring an additional claim under ERISA § 502(a)(3) will be discussed herein.

4

## II.     JURISDICTION

The Court has subject-matter jurisdiction because a federal question is presented. *See* 28 U.S.C. § 1331.

## III.     STANDARD OF REVIEW

ERISA allows a plan participant to sue "to recover benefits due to him under the terms of his plan . . . ." ERISA § 502(a)(1)(B). Courts review an ERISA fiduciary or administrator's denial of benefits under either a *de novo* standard or the more deferential arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 107 (1989).[5] Whether a court applies the *de novo* or arbitrary and capricious standard, only evidence in the administrative record should be considered. *Id.* (citing *Wilkins*, 150 F.3d at 619).

The arbitrary and capricious standard is appropriate where "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 566 (6th Cir. 2013) (citing *Firestone Ture & Rubber Co.*, 489 U.S. at 115; *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 364-65 (6th Cir. 2009)). "Although 'magic words' are not required, [the] [Sixth Circuit] 'has consistently required that a plan contain a clear grant of discretion' to the administrator or fiduciary before applying the deferential arbitrary and capricious standard." *Id.* (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (emphasis omitted)

---

[5] Oakman contends that the applicable standard of review in this case falls under Fed. R. Civ. P. 56(c) (i.e., a motion for summary judgment). (*See* Pl.'s Resp. Def.'s Mot. J. Admin. R. 5). The Sixth Circuit has consistently "rejected applying Rule 56 in ERISA denial-of-benefits actions . . . ." *Kramer v. Am. Elec. Power Exec. Severance Plan*, 128 F.4th 739, 751 (6th Cir. 2025) (citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998)). This is "because the summary-judgment standard is 'designed to screen out cases not needing a full factual hearing,' so 'apply[ing] Rule 56 after a full factual hearing has already occurred before an ERISA administrator [would be] pointless.'" *Id.* (quoting *Wilkins*, 150 F.3d at 619) (alterations in original).

5

(internal quotation marks omitted). Under the arbitrary and capricious standard, a court "will uphold the administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006) (quoting *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)). To survive this standard, the decision to deny benefits must be "rational in light of the plan's provisions." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (internal quotation marks omitted) (citations omitted).

Here, both parties agree that The Plan grants discretionary authority to GM and the Pension Committee to determine benefits in accordance with The Plan's language. (*See* Def.'s Mem. Supp. Mot. J. Admin. R. 11, DN 58-1; Pl.'s Resp. Def.'s Mot. J. Admin. R. 15). The Plan contains the following provision: "[GM] is the Plan Administrator and has the full authority to construe, interpret and administer the Plan." (Admin. R. 134). The Plan also establishes that GM will appoint members to a Pension Committee, which "shall have authority . . . to approve authorizations for pension benefits." (Admin. R. 193, 216). Because both parties agree that the decisions made by GM would be entitled to deferential review under The Plan's terms, the Court will apply the arbitrary and capricious standard. (Pl.'s Resp. Def.'s Mot. J. Admin. R. 15).

### IV.   DISCUSSION

#### A.   Motion for Judgment on the Administrative Record

In accordance with his rights under The Plan, Oakman filed a claim with the Pension Committee seeking to add his years of employment with ASC to his credited service with GM. (Admin. R. 6-7, 222). Oakman notes that The Plan contains two seemingly contradictory provisions: First, Article III, Section 1(a)(1) sets forth the main provision for determining years of credited service, stating that "[c]redited service shall be computed for each calendar year for

6

each employee on the basis of total hours compensated by any plant or Division of General Motors LLC during such calendar year while the employee has unbroken seniority." (Admin. R. 6, 116). Second, Article III, Section 1(k) states that "**Notwithstanding any other Section of this Article III,** . . . the employee's credited service for the period prior to January 1, 1996[,] shall not be less than the employee's seniority as of December 31, 1995." (Admin. R. 6, 123 (emphasis added)). In his appeal, Oakman argued that his years of credited service should include his time at ASC because his seniority status from his time at ASC was expressly converted to credited service by Section (1)(k) as part of the joint venture. (Admin. R. 6). The Plan rejected this argument and determined that Oakman's "eligible period of service fill[6] is only from April 17, 1995[,] through December 31, 1995[,] under Article III, Section 1(k)[,]" as he cannot receive credit for time he was "not employed by and received no compensation from GM." (Admin. R. 6). Effectively, the Pension Committee determined that the language of Section 1(k) does not modify the calculation of years of credited service under Section 1(a)(1), and because Oakman was not an employee of GM prior to April 17, 1995, the Pension Committee determined he could not accrue hours towards his credited service before this date. (Admin. R. 6-7).

The Plan argues that, under the arbitrary and capricious standard, its determination was well supported by the records and Plan language. (Def.'s Mem. Supp. J. Admin. R. 12-13). The Court disagrees with this contention. The arbitrary and capricious standard is highly deferential,

---

[6] The language of "service fill" appears to reference a "1995 Service Fill" utilized under The Plan by GM Benefits. (Oakman Docs. 88). Communications in 2019 between GM Benefits employees state the following: "The 1995 Service Fill does not provide service fill for periods of service not in [The Plan]." (Oakman Docs. 88). It appears that GM Benefits used the 1995 Service Fill to credit service for certain GM employees who transferred back to The Plan under a 2008 provision. (Oakman Docs. 88). Although the Pension Committee's decision to deny Oakman's additional benefits is given deference under the arbitrary and capricious standard, the Court must still analyze whether The Plan's terms were interpreted in a rational manner. *Jones*, 385 F.3d at 661.

7

"[i]t is not, however, without some teeth." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161 (6th Cir. 2003) (internal citation and quotations omitted) (citation omitted). As the Sixth Circuit has stated, "[d]eferential review is not no review, and deference need not be abject." *Id.* (internal quotations omitted) (citations omitted). In the current case, it is clear that The Plan's interpretation of the determination of benefits was not "the result of a deliberate, principled reasoning process" because its decision expressly contradicts the terms of The Plan. *Elliott*, 473 F.3d at 617 (internal quotation marks omitted) (citations omitted). The Plan bases its decision on the language of Section 1(a)(1) without acknowledging that Section 1(k) begins with **"[n]otwithstanding any other Section of this Article III . . . ."** (Admin. R. 123 (emphasis added)). The Supreme Court has found that the term "notwithstanding" has an explicit definition in contract interpretation:

> The ordinary meaning of "notwithstanding" is "in spite of," or "without prevention or obstruction from or by." *Webster's Third New International Dictionary* 1545 (1986); *Black's Law Dictionary* 1091 (7th ed. 1999) ("Despite; in spite of"). In statutes, the word "shows which provision prevails in the event of a clash."

*N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 301 (2017) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 126-27 (2012)). In this case, it is clear that the language of Section (1)(k) overrides the calculation of credited service under Section 1(a)(1), as Section (1)(k) applies "without prevention or obstruction" by any other provision of Article III. *Id.*[7] Thus, under the terms of The Plan, Oakman is entitled to a calculation of credited service consistent with his seniority status.

---

[7] In the absence of the "notwithstanding" clause, there would exist ambiguity between Section 1(a)(1) and Section (1)(k). In light of the discretionary authority vested in GM according to The Plan's terms, this ambiguity may have constrained the Court to defer to The Plan's interpretation under the arbitrary and capricious standard. Nevertheless, this is not the case at hand. The "notwithstanding" language removes any ambiguity: Section (1)(k) clearly trumps all other Sections within Article III.

None of The Plan's arguments sufficiently rebut this fact. The Plan argues that the joint venture's carryover seniority date was "expressly limited for the purpose of determining vacation and other paid time off only." (Def.'s Mem. Supp. J. Admin. R. 13; *see* Admin. R. 9, 12). Although the terms of the joint venture state that "[t]he [GM] seniority date will be utilized as the date established for each employee for vacation pay allowance and paid absence allowance credit[,]" there is no language specifying that the seniority date can be used only for these purposes. (Admin. R. 12). Even if the agreement did contain this exclusionary language, it is the terms of The Plan itself which govern its interpretation. *See Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) (citing *CIGNA Corp. v. Amara*, 563 U.S. 421, 437 (2011)) (recognizing "the particular importance of enforcing plan terms as written in § 502(a)(1)(B) claims."). Courts look to the "[o]rdinary principles of contract interpretation" in evaluating ERISA plans. *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013). At times, "[t]he words of a plan may speak clearly[;]" however, the Court may need to "'look outside the plan's written language' to decide what an agreement means." *Id.* (citing *CIGNA Corp.*, 563 U.S. at 436). This is not the case here, as The Plan's terms clearly indicate that Section (1)(k) is meant to override Section 1(a)(1) through its use of "notwithstanding."

Simply put, the Pension Committee interpreted The Plan's terms in an arbitrary and capricious manner by ignoring Section (1)(k)'s predomination over Section 1(a)(1). The Plan argues that interpreting Section 1(k) in this manner "would be contrary to the express terms of the GM Pension Plan and [] not supported by the terms of the Joint Venture." (Def.'s Mem. Supp. Mot. J. Admin. R. 14). This point is not well-taken, as giving Oakman credited service equal to seniority status prior to January 1, 1996, not only complies with the language of Section (1)(k)—it is mandated. (Admin. R. 116). Therefore, the Pension Committee's determination that Oakman

could only be credited for time he was employed by GM (i.e., after April 1995) is not "rational in light of the plan's provisions." *Jones*, 385 F.3d at 661 (internal quotation marks omitted) (citations omitted).

"A primary purpose of ERISA is to ensure the integrity and primacy of the written plans." *Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir. 1997) (citations omitted). To accomplish this goal, "the plain language of an ERISA plan should be given its literal and natural meaning." *Id.* (citation omitted). The decision to deny Oakman's request for additional benefits was arbitrary and capricious, as it did not comport with the express language of The Plan. The Plan argues that the Court should consider the intent of the parties who formed the joint venture in interpreting The Plan's language. (Def.'s Mem. Supp. Mot. J. Admin. R. 14). Although federal common law allows courts to "fill[] the gaps of ERISA to assist in the interpretation of ERISA plans[,]" "federal courts may not apply common law theories to alter the express terms of written benefit plans." *Heath Cost Controls*, 139 F.3d at 1072 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987)) (citations omitted). Here, The Plan's express terms demand that Oakman's "credited service for the period prior to January 1, 1996[,] shall not be less than the employee's seniority as of December 31, 1995." (Admin. R. 6, 123). Throughout every audit of Oakman's record that GM Benefits conducted, it was determined, pursuant to the joint venture, that Oakman's date of seniority was September 27, 1989 (i.e., his initial date of ASC employment). (Admin. R. 1, 35, 309). Contrary to The Plan's argument that giving Oakman credited service based upon this seniority date "would be contrary to the express terms of the GM Pension Plan[,]" it appears just the opposite is true. (Def.'s Mem. Supp. Mot. J. Admin. R. 14). Ignoring this fact demonstrates "an absence of reasoning in the record to support" the Pension Committee's decision. *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 173 (6th Cir. 2003) (quoting *Hackett v. Xerox Corp. Long–*

*Term Disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003)). The Court finds that this "absence of reasoning" constitutes an arbitrary and capricious decision. *See id.* The Plan's motion for judgment on the administrative record is denied on these grounds.[8]

### B. Oakman's Cross-Motion for Judgment on the Administrative Record

The Court has denied The Plan's motion for judgment on the administrative record and determined that Oakman is entitled to credited service under The Plan equal to his seniority status. This leaves this case, however, in a procedural quandary, as Oakman failed to file a timely dispositive motion for judgment on the administrative record. The Scheduling Order from September 15, 2023, stated: "No later than June 28, 2024, the parties **shall file** simultaneous briefs as set forth in the concurring opinion in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998). The parties **shall file** simultaneous responses no later than thirty (30) days after the motions for judgment." (Scheduling Order 2, DN 47 (emphasis added)). The filing deadline was subsequently extended to July 29, 2024. (Order, DN 52). The Plan complied with this order

---

[8] Oakman also attempts to bring claims for breach of fiduciary duty and equitable estoppel under ERISA § 502(a)(3). (Am. Compl. ¶ 9; Pl.'s Resp. Def.'s Mot. J. Admin. R. 7). The Amended Complaint only states one cause of action: recovery of denied benefits under ERISA § 502(a)(1)(B). (Am. Compl. ¶ 27). Even if Oakman did state a separate cause of action under ERISA § 502(a)(3), he has failed to demonstrate how it would not simply be a repackaging of his claim under Section 502(a)(1)(B). *See Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 372 (6th Cir. 2015) (en banc) (citing *Wilkins*, 150 F.3d at 615) (stating that a plaintiff is not entitled to relief under ERISA § 502(a)(3) where "such relief is unnecessary and unavailable because he has an adequate remedy under [Section] 502(a)(1)(B)."). Because the injury associated with the claim for breach of fiduciary duty is not "separate and distinct from the denial of benefits[,]" Oakman cannot sustain an ERISA § 502(a)(3) claim under this theory. *See id.* at 372-73 ("Impermissible repackaging is implicated whenever, in addition to the particular adequate remedy provided by Congress, a duplicative or redundant remedy is pursued to redress the same injury."). Furthermore, Oakman's potential equitable estoppel claim fails because he has not sufficiently demonstrated that The Plan engaged in "intended deception or such gross negligence as to amount to constructive fraud." *Bloemker v. Laborers' Loc. 265 Pension Fund*, 605 F.3d 436, 443 (6th Cir. 2010) (quoting *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 431 (6th Cir. 2007)). Therefore, all potential claims under ERISA § 503(a)(3) are dismissed.

11

by filing its motion on July 29, 2024. Oakman did not file a dispositive motion until he attached this cross-motion to his response, which was filed on September 17, 2024. The Court allotted Oakman additional time to file his response; however, no permission was sought or given for Oakman to file a dispositive motion after the July 29 deadline. (Order, DN 61). This Court has previously stricken motions filed after a scheduling order's deadline, particularly when the party has not sought permission from the Court to do so under the good cause and excusable neglect standard of Fed. R. Civ. P. 6(b). *See GreenCity Demo, LLC v. Wood Env't & Infrastructure Sols., Inc.*, No. 3:19-CV-146-RGJ, 2022 WL 17553026, at *3-4 (W.D. Ky. Dec. 9, 2022).

On March 27, 2025, Oakman was ordered to "to show cause how he satisfies the requirements of good cause under Fed. R. Civ. P. 16(b)(4) and excusable neglect under Fed. R. Civ. P. 6(b)(1)(B) for the Court to consider the merits of his cross-motion." (Order 1, DN 72 (citing *Century Indem. Co. v. Begley Co.*, 323 F.R.D. 237, 240-41 (E.D. Ky. 2018))). Oakman filed a response brief on April 17 (DN 73). "In order to demonstrate good cause, the plaintiff must show that the original deadline could not reasonably have been met despite due diligence and that the opposing party will not suffer prejudice by virtue of the amendment." *Ross v. Am. Red Cross*, 567 F. App'x 296, 306 (6th Cir. 2014). "The movant must 'explain why he failed to move for the amendment at a time that would not have required a modification of the scheduling order.'" *Century Indem. Co.*, 323 F.R.D. at 241 (quoting *Korn v. Paul Revere Life Ins., Co.*, 382 F. App'x 443, 450 (6th Cir. 2010)).

Oakman's brief focuses entirely on the issues of prejudice and excusable neglect, without providing any explanation why the original deadline could not have been met. (*See* Pl.'s Resp. Show Cause Order 1-2, DN 73). He states that his cross-motion was untimely filed because he "did not anticipate filing a Cross Motion[,] . . . [but that] in preparing his response, [he] determined

12

there were grounds to file such a motion." (Pl.'s Resp. Show Cause Order 1). To reiterate: both parties were ordered to submit simultaneous briefs "[n]o later than June 28, 2024 . . . ." (Scheduling Order 2). It is not clear why Oakman interpreted this language as voluntary, but it unfortunately must result in the denial of his cross-motion as untimely. By Oakman's own words, this "procedural misstep occurred due to inadvertence and oversight . . . ." (Pl.'s Resp. Show Cause Order 1). Because he has failed to provide a sufficient reason for the delay, Oakman has not met his burden under Rule 16(b)(4). *Century Indem. Co.*, 323 F.R.D. at 241 ("Where the movant provides 'no excuse' for the delay, he has failed to show good cause." (citing *Leary v. Daeschner*, 349 F.3d 888, 907 (6th Cir. 2003))). This finding is particularly unfortunate, considering the Court's determination that Oakman should be entitled credited service under The Plan equal to his seniority status; however, the scheduling order mandated by Rule 16 must be respected, as it "ensure[s] that 'at some point both the parties and the pleadings will be fixed.'" *Century Indem. Co.*, 323 F.R.D. at 240 (alteration in original) (internal quotation marks omitted) (quoting *Leary*, 349 F.3d at 906). The Court reluctantly concludes that Oakman's cross-motion must be denied as untimely and his claims against The Plan are dismissed.[9]

---

[9] Neither Oakman's nor The Plan's motion refers to Fidelity as a party in this action. The only mentions of Fidelity within the motions reference its records system where Oakman viewed his retirement information. (Def.'s Mem. Supp. Mot. J. Admin. R. 8; Pl.'s Resp. Def.'s Mot. J. Admin. R. 5, 10). The Amended Complaint indicates that Oakman brought this suit against Fidelity "as plan administrator for The Plan." (Am. Compl. ¶ 1). The Plan, however, "denies that [Fidelity] is the Plan Administrator of the Plan as defined under ERISA." (Ans. Am. Compl. 1, DN 38). In ERISA suits concerning the denial of benefits, a plan administrator is not always a necessary party; however, a *claim* administrator, who acts as a fiduciary, is considered a necessary party. *Nixon v. Anthem, Inc.*, No. 3:19-CV-00076-GFVT, 2020 WL 4910290, at *4 (E.D. Ky. Aug. 18, 2020) (citing *Ciaramitaro v. Unum Life Ins. Co. of Am.*, 521 F. App'x 430, 438 (6th Cir. 2013); *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006)). There is no evidence here that Fidelity acted as a claim administrator. The Plan explicitly states that "[GM] is the Plan Administrator and has the full authority to construe, interpret and administer the Plan." (Admin. R. 134). Furthermore, for Fidelity to constitute a third-party fiduciary, Oakman would need to demonstrate that it exercised "*discretionary authority* over plan management, or *any* authority or

## V.     CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Defendant's Motion for Judgment on the Administrative Record (DN 58) is **DENIED**.

2. Plaintiff's Cross-Motion (DN 63) is **DENIED AS UNTIMELY.**

3. Plaintiff's claims against Defendants The Plan and Fidelity are **DISMISSED**.

4. The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

August 6, 2025

cc:     counsel of record

---

control over plan assets." *Briscoe v. Fine*, 444 F.3d 478, 488 (6th Cir. 2006) (citing 29 U.S.C. § 1002(A)(21)). It does not appear that Oakman has made this argument in any of his filings. What is clear is that Oakman was required to move for judgment on the administrative record against all parties pursuant to the Scheduling Order, which he failed to do in a timely manner. (Scheduling Order 2). For this reason, all of Oakman's claims must be dismissed, including any potential claim against Fidelity.

14